NATIONAL MEMORIAL PARK, Inc., v.
COMMISSIONER OF INTERNAL
REVENUE.

No. 5285.

Circuit Court of Appeals, Fourth Circuit.

Nov. 13, 1944.

Llewellyn A. Luce and Robert H. McNeill, both of Washington, D. C., for petitioner.

Harold C. Wilkenfeld, Sp. Asst. to Atty. Gen. (Samuel O. Clark, Jr., Asst. Atty. Gen., Sewall Key and J. Louis Monarch, Sp. Assts. to Atty. Gen., on brief), for respondent.

Before PARKER, DOBIE, and NORTHCOTT, Circuit Judges.

DOBIE, Circuit Judge.

By this appeal National Memorial Park, Inc. (hereinafter called petitioner), seeks reversal of a decision of the Tax Court of the United States, determining deficiencies in income and excess-profits taxes for the years 1935, 1936 and 1937, and penalties for 1935 and 1937.

Petitioner is a Delaware corporation, organized September 7, 1933, engaged during the years in question in the business of operating a cemetery, known as "National Memorial Park", located in Fairfax County, Virginia.

Sometime during 1933, at a cost of $32,-202.32 petitioner acquired 92.986 acres of land in Virginia. This acreage was plotted into 24,429 salable four-grave cemetery lots. The balance was unsalable property, such as roads and paths.

On June 22, 1934, pursuant to a resolution adopted by petitioner's board of directors on June 12, 1934, petitioner entered into a trust agreement with the City National Bank of Philadelphia. Under the terms of this agreement, the City National Bank was to act as trustee, and all moneys received from the sale of burial lots were to be deposited with the Trustee as Depository.

Certain provisions of the trust agreement which are particularly germane to the questions on appeal are herein set forth ipsissimis verbis:

"* * * No sections of lots in the Memorial Park shall be sold unless an initial cash payment of at least 20% of the purchase price is made by the purchaser at the time of the execution of the contract of sale. Upon receipt of such payment of 20% the trustee shall credit the same to the General Fund.

"* * * Each subsequent payment made by the purchaser of a section or lot in the Memorial Park when received by the trustee shall be credited by it to the General Fund, until one-half of the purchase price is paid when the balance of payments shall be apportioned as follows:

(a) Perpetual Maintenance Fund.... 20%
(b) Improvement Fund............. 40%
(c) General Fund................. 40%

Total ....................100%

so that when payment is made in full by the purchasers of a section or lot in the Memorial Park the Trustee shall have credited the same as follows:

(a) Perpetual Maintenance Fund.... 10%
(b) Improvement Fund............. 20%
(c) General Fund................. 70%

Total ....................100%

"* * * The Memorial Park covenants and agrees that each purchaser of a section or lot will receive a good and sufficient deed of right of sepulchre to such section or lot in the Memorial Park when payment of all installments of purchase price and interest have been made in full.

"* * * A sum equal to 10% of the gross proceeds of funds arising from the sale of sections or lots in the Memorial Park shall as above provided be set apart and shall constitute a Perpetual Maintenance Fund, for the perpetual care and preservation of the grounds and the repair and renewal of the Memorial Park. A total of 10% of the total purchase price of all sections of lots shall be deducted from the payments on account of the purchase price of said sections or lots in the respective percentages hereinbefore enumerated. The principal of such fund shall be held intact by the trustee and shall be invested in the

manner hereinafter stated, and the net income from the principal of such fund shall be paid by the trustee to the Memorial Park. The Memorial Park covenants and agrees to use the income so received from the Perpetual Maintenance Fund for the perpetual care and preservation of the grounds, and the repair and renewal of the buildings and property of the Memorial Park.

"The principal of such Perpetual Maintenance Fund shall be invested and re-invested from time to time by the trustee in such securities as from time to time shall constitute a legal investment for trustees under the laws of the State of Pennsylvania.

\* \* \* 20% of the total selling price of all sections or lots in the Memorial Park shall be set aside and shall constitute an Improvement Fund. The money so set apart for the Improvement Fund shall be expended for the purpose of developing, enlarging, improving and beautifying the Memorial Park, including the landscaping of the grounds, construction of roads, entrances, walls and a memorial chapel, the purchase or (sic) equipment, and for any other charges which, in the judgment of the Board of Directors of the Memorial Park, shall be necessary or proper for the establishment of a Memorial Park or burial ground to be known as National Memorial Park.

"Payments from such Improvement Fund shall be made by trustee upon the following terms and conditions:

"(a) Upon presentation of a certificate of the architects or engineers having supervision of the particular work or improvement, certifying that the amount or amounts specified are due for labor and material furnished, or expenses incurred in the improvement of the Memorial Park provided, however, that such certificate shall be accompanied by the written approval of the officers of the Memorial Park who shall be authorized to approve the same.

"(b) Upon presentation of bills or statements of architects, engineers, attorneys or any other persons who have performed services or incurred expenses in connection with the improvement of the Memorial Park, under the direction of the proper officers of the Memorial Park, where such services are not performed under the supervision of any architect or engineer, and where such bills or statements are accompanied by the written approval of the officers of the Memorial Park who shall be authorized to approve the same.

"(c) Upon presentation by the officers of the Memorial Park of cancelled checks or other evidence satisfactory to the trustee showing amounts expended in *purchasing and acquiring title to real estate for the purpose of the Memorial Park,* together with a certified copy of a resolution of the Board of Directors of the Memorial Park certifying that the amounts specified have been expended for such purpose, and requesting the trustee to reimburse the Memorial Park out of the Improvement Fund for such expenditures.

"(d) Payments not in excess of the sum of $150.00 shall be made upon receipt of a written requisition, signed by the President and Comptroller." (Italics ours.)

The moneys deposited in the General Fund were subject to the disposition of petitioner with no supervision or control by the trustee. Nor was the trustee under any obligation to see to the application of any of the money so paid to petitioner. A further provision of the agreement provided:

"It is agreed by and between the parties hereto, however, that in order that lots may be properly conveyed as sold that the said Memorial Park will immediately upon the execution hereof and from time to time thereafter as the same may become necessary, convey to the trustee by good and sufficient deed of conveyance title in fee to the ground upon which are located no less than three thousand (3,000) lots free of mortgage lien, and does hereby covenant and agree to and with the said trustee not to sell or dispose of the right of sepulchre to any section or lot other than those lots to which title has been conveyed to the trustee as aforesaid, and the trustee for its part agrees that it will hold title to such ground as may be conveyed to it in accordance with the terms hereof as trustee for the said Memorial Park and its assigns, and that it will upon receipt of the purchase price from individual purchasers convey by approved deed sections or lots and the right of sepulchre therein to the purchasers thereof, and that it will not in any manner or form alien or encumber the said ground, but will hold it solely for the uses and purposes herein specified."

On December 10, 1934, in compliance with the terms of the trust agreement, petitioner conveyed 3,004 lots to the nominee of City National Bank, and on December

6, 1937, the entire property of the cemetery was conveyed to the bank's nominee.

By the terms of the sales contracts used by petitioner during the years in question, petitioner agreed, upon full payment being made by the purchaser, to deliver "good and sufficient deed" to the allotted section, and further to set aside and build up a maintenance and an improvement fund. The contracts of sale were received in petitioner's office, together with the down payments.

When, and only when, 20 per cent or more of the sales price had been paid, petitioner deposited the money collected in the Hamilton National Bank for the account of City National Bank, at which time a statement called a "collection advice", listing the amounts received from each customer and the allocation of these amounts to the various funds, was prepared and sent to City National Bank. If the purchaser did not complete payments up to 20 per cent of the purchase price, the money was retained by petitioner.

When the final payment was made by the purchaser, petitioner delivered a deed, executed by the bank or its nominee, to the purchaser. These deeds provided in part as follows:

"That the said Grantor for and in consideration of the sum of $10.00 * * * and other good and valuable considerations * * * has granted, bargained, sold, released, conveyed and confirmed, and by these presents does grant, bargain, sell, release, convey and confirm unto the said Grantee his heirs and assigns, subject to the conditions and restrictions hereinafter set forth, the right of sepulchre and the right to the exclusive use, occupation and possession for that purpose only in the lot of ground in the said National Memorial Park. * * *

"The said Grantor as aforesaid, hereby covenants to and with the said party of the second part, his heirs and assigns, that of the purchase price of all cemetery lots in this said Park there will be set aside thirty (30%) percent, of which fund the City National Bank of Philadelphia shall be trustee; one third of this said fund shall be capitalized and held intact and the income therefrom shall be used solely and perpetually for the purpose of maintenance and preservation of the said Memorial Park and for the proper upkeep thereof and the other two-thirds thereof shall be used to erect buildings and make improvements."

When petitioner expended money for improvements it forwarded to the City National Bank a statement called "improvement certificate" which showed the amount expended for each improvement and certified that such amounts had been so spent. These certificates were either approved or disapproved by the bank and then, as money accumulated in the improvement fund, the bank made reimbursement to petitioner and applied the reimbursement against the sum which had been certified to the bank by petitioner.

The amounts of the improvement certificates certified by petitioner, and the amounts paid thereon by City National Bank during the taxable years, are as follows:

|      | Improvement Certificate | Amount Paid |
|------|-------------------------|-------------|
| 1935 | $31,625.05              | $13,794.82  |
| 1936 | 46,603.15               | 57,761.85   |
| 1937 | 52,425.69               | 51,887.52   |

During the same period petitioner spent the following amounts for improvements:

| 1935 | $79,699.83 |
|------|------------|
| 1936 | 39,582.57  |
| 1937 | 47,234.85  |

In filing its returns for the taxable years, petitioner took the position that it was regularly engaged in selling personal property. In its returns petitioner answered the question as to the basis of the return by writing in the word "installment". Petitioner's books were kept on the accrual basis. In computing its gross income for these years petitioner excluded 30.64 per cent of its cash collections for each year. The figure, 30.64 per cent, was computed in this manner: maintenance fund, 10 per cent; improvement fund, 20 per cent; and land cost, .64 per cent. Petitioner's returns for the years 1935 and 1937 were not filed within the time prescribed by law.

It was the Commissioner's contention that petitioner was engaged in selling realty, not personalty, and thus is brought within the ambit of section 44(b) of the Revenue Acts of 1934, 1936 and 1938, 26 U.S.C.A. Int.Rev.Code, § 44(b), and Articles 44-2 and 44-3 of Regulations 86, 94 and 101; that petitioner was not permitted to use the installment basis for reporting profit from lot sales. The Commissioner further contended that the amounts representing 20 per cent of the sales price of lots sold in the taxable years were not

impressed with a trust in the "Improvement Fund".

The Tax Court sustained the position of the Commissioner in every instance except one, (with which we are not here concerned) and from this decision the petitioner has duly appealed.

There is no dispute as to the facts in this case. We are here confronted only with two questions of law: (1) whether as a matter of law, and for the purposes of federal income taxes, a valid trust was established and carried out by petitioner with City National Bank of Philadelphia; and (2) whether "the rights of sepulchre" sold by petitioner constituted personalty or real property.

In determining the validity of the "Improvement Fund" as a trust, the corpus of which is exempt from taxation, we are not governed solely by the printed words of the trust agreement, or the title by which it is called. While it is true that in some instances the nomenclature used by the settlor may indicate his intent, for our purposes, the facts, plus all their subtle nuances, must sustain the validity of the trust.

Outside the trust agreement in this case, the amounts received from the sale of these cemetery lots would clearly be income, and no portion of that income could be deducted, for the purposes of taxation, solely on the ground that petitioner had made a general agreement to establish such a fund. American Cemetery Co. v. United States, D.C., 28 F.2d 918. Receipts cannot, in this connection, be considered trust funds unless the trust is definitely established and maintained. Memphis Memorial Park v. Commissioner of Internal Revenue, 28 B. T. A. 1037, affirmed, 6 Cir., 84 F.2d 1008.

While it is true in the case at bar that petitioner agreed to maintain "intact" that portion of the receipts to be used for perpetual maintenance, no such promise was made regarding the improvement fund. Petitioner merely covenanted to set aside and build up a fund for improvement purposes.

In this connection, we consider certain facts found by the Tax Court as very important. The particular allocation of amounts to the various funds was under the direction of petitioner by means of its "collection advices." By the express words of the trust agreement petitioner was to deposit all money received from purchasers "with the Trustee as Depository." The improvement program, entirely under petitioner's control, was carried on without regard for the Improvement Fund in the hands of the bank. That fund was to be used to reimburse petitioner for its advance expenditures or accruals. It was left within the discretion of petitioner's directors as to what expenses should be incurred within the wide range of general construction and improvement described in the sixth paragraph of the agreement. Nor was there any essential relation between the amounts which the bank paid to petitioner in the taxable years against improvement certificates, and either the total amounts which petitioner paid to the bank in each year, or the amounts excluded from gross income in each year.

An examination of the cases concerned with the validity of such trusts (many of which were strongly relied on by petitioner) shows that the questions of control by, and inurement to the benefit of, the taxpayer, are of prime importance, and in most cases are controlling.

The test of validity proposed in American Cemetery Co. v. United States, supra, 28 F.2d at page 919, prescribes:

"If * * * a trust is created, and a taxpayer is bound, either by statute or its agreement, to pay certain sums into a trust fund, *and if such trust fund is entirely beyond its control, and if the principal and income from such trust cannot inure to the benefit of the plaintiff,* then the sums paid into the trust are not considered as a part of the plaintiff's income." (Italics ours.)

See also, Troost Avenue Cemetery Co. v. United States, D.C., 21 F.2d 194; Inglewood Park Cemetery Association v. Commissioner, 6 B. T. A. 386; Greenwood Cemetery Association, 2 B. T. A. 910.

In the American Cemetery Co. case (on which petitioner relies) the plaintiff agreed with a trust company to pay over a certain proportion of the sale price of each lot until the sum of $2,500 per acre was reached. The trust company agreed that *income* would be paid over to the plaintiff for use in maintenance and care only, of the whole cemetery. Any sums not expended for such uses were to be retained by the trust company. While it is true that the court held that the amounts paid in were not taxable income, it used these words, 28 F.2d at page 919: "The trust being irrevocable, and *both the principal and income being forever beyond the reach of the plaintiff for its own use,* the amounts paid to

the trustee * * * is not taxable income." (Italics ours.)

Finally, by the terms of the agreement, petitioner might use the improvement fund to enlarge Memorial Park. This was without restriction. The sole requirement was that the expenditure of such amounts be certified by resolution of petitioner's board of directors.

Words of the Tax Court in Memphis Memorial Park, supra, 28 B. T. A. at page 1043, are, we think, peculiarly applicable here:

"Then, too, the contract leaves the expenditure of the fund so far to the discretion of the directors as to prevent the establishment of a definite trust for a specific purpose. The 'purpose of developing, enlarging, improving, * * * including real estate' might well authorize the purchase of additional property * * *."

█ Petitioner contends that the provision in the deeds that "the other two-thirds thereof (of moneys set aside) shall be used to erect buildings and make improvements", qualifies and restricts the provisions of the trust agreement providing for the "enlarging" of Memorial Park. This, we think, is an open question. However, other and broader powers (considered herein), vested in petitioner's directors, caused the Tax Court to determine that the benefits flowing from the improvement fund went primarily to petitioner. After careful consideration, we think the Tax Court is correct.

Even were it admitted that the improvement fund constituted a valid trust, though we think the broad extent of the power of control over this fund vested in the petitioner denies this, there could still be no deduction of the fund from income where (as here) it is shown that the benefit of the fund inured primarily to the petitioner. Cf. American Cemetery Co. v. United States, supra. The improvement program was carried out without regard for, and quite apart from, the improvement fund in the hands of the bank. The fund, which petitioner voluntarily created with the bank without definite obligation to its vendees, served merely as a reimbursing fund to cover petitioner's advances for improvements. In any year petitioner was entitled to receive any amount which was spent for improvements and duly certified. Thus we think, as did the Tax Court, that the primary beneficiary of the fund was the petitioner.

It is not unimportant that the cases relied on by petitioner involve the interpretation of trust funds providing for perpetual maintenance. Further, the fund in those instances was to remain inviolate, just as was the Perpetual Maintenance fund here. Petitioner seeks to apply those cases sustaining the perpetual maintenance funds to its own improvement fund. In our opinion there is a distinct difference between the two. By the very nature of the maintenance fund, it must remain inviolate.

In the instant case the improvement fund, denuded by the impact of surrounding facts, proves to be nothing more than a conduit, channelling the money from the purchaser to the beneficial use of the petitioner. Any increase in the value of the lots, through improvement, is a direct benefit to petitioner.

Until 50 per cent of the purchase price has been paid, petitioner might withdraw the entire amount allocated to the fund. No one, purchaser vel non, could complain or seek protection under the agreement until this was done. Compare, Portland Cremation Association v. Commissioner of Internal Revenue, 9 Cir., 31 F.2d 843.

In our opinion, and we so hold, the very broad extent of the discretion and control lodged in petitioner is altogether inconsistent with the idea that the·fund is impressed with a trust. Further, since the petitioner is the primary beneficiary of the fund, no deduction can be allowed, irrespective of the question as to whether or not the fund is a valid trust.

█ Petitioner contends that taxation of this trust will destroy its ability to carry on its business. In this connection it is clear from the record that petitioner has not been denied a deduction for money actually spent for improvements. The Commissioner denied the exclusion of a flat 20 per cent of gross receipts. He adopted as the basis for the cost of each year's sales the cost of the land plus cost of land improvement allocated proportionately to the square feet of land in the lots sold. The Tax Court agreed with this method and we think the Tax Court was correct.

█ Though it is true that a taxpayer using the accrual basis may take into account items which are fixed and ascertainable, petitioner has made no such definite showing sufficient for the purposes of accrual accounting. Cf. Acacia Park Cemetery Ass'n v. Commissioner of Internal Revenue, 7 Cir., 67 F.2d 700; Cedar Park

Cemetery Ass'n v. Commissioner of Internal Revenue, 7 Cir., 67 F.2d 699, certiorari denied, 292 U.S. 639, 54 S.Ct. 773, 78 L.Ed. 1491. Petitioner was not obligated to make any specific improvements, either in kind or amount. If made upon land ultimately to be ·sold, the cost ·of any improvements actually made would be added to petitioner's cost basis for the land (this was done by the Commissioner here) and would be deducted accordingly. If made on land retained by the petitioner, the cost of permanent improvements would be recovered through depreciation allowance. This method allows petitioner to recover cost of improvements actually made, in the same manner as any other taxpayer in a similar situation.

Should the taxpayer prevail here, the door would be open for cemetery companies to establish such funds with very elastic provisions allowing an increase in economic benefit without tax liability. Such a situation is altogether inconsistent with the idea of an equitable, proportionate tax burden.

Petitioner urges most strenuously that it is a dealer in personalty, and is not engaged in the sale of realty. Section 44 of the Revenue Acts of 1934, 1936 and 1938, 26 U.S.C.A. Int.Rev.Code, § 44 provides:

"(a) Dealers in personal property. Under regulations prescribed by the Commissioner with the approval of the Secretary, a person who regularly sells or otherwise disposes of personal property on the installment plan may return as income therefrom in any taxable year that proportion of the installment payments actually received in that year which the gross profit realized or to be realized when payment is completed, bears to the total contract price.

"(b) Sales of realty and casual sales of personalty. In the case (1) of a casual sale or other casual disposition of personal property (other than property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year), for a price exceeding $1,000, or (2) of a sale or other disposition of real property, if in either case the initial payments do not exceed 30 per centum of the selling price (or, in case the sale or other disposition was in a taxable year beginning prior to January 1, 1934, the percentage of the selling price prescribed in the law applicable to such year), the income may, under regulations prescribed by the Commissioner with the approval of the Secretary, be returned on the basis and in the manner above prescribed in this section. * * *"

■ Whether the sale of a "right of Sepulchre" here involves a sale of personalty, or is a sale of realty, is clearly to be determined by the law of Virginia.

The question has been considered on three occasions by the Virginia Supreme Court of Appeals. In Roanoke Cemetery Co. v. Goodwin, 101 Va. 605, 44 S.E. 769, the court held the lot owner's interest to be "in the nature of an easement", with the exclusive right to bury in the lots, subject to the general proprietorship and control of the association. In the most recent case, Goldman v. Mollen, 168 Va. 345, 191 S.E. 627, the court again called the lot holder's interest one "in the nature of an easement", citing the Roanoke case with approval.

Petitioner strongly relies on Grinnan v. Fredericksburg Lodge No. 4 A. F. & A. M., 118 Va. 588, 88 S.E. 79, Ann.Cas.1918D, 729. There the court said the lot holder had a mere privilege or license to make interments. However, that case, on its facts, is not inconsistent with the Roanoke and Goldman cases. "Privilege" was the apt term in that case. The lots had not been purchased. To the plaintiffs had been extended the mere privilege of making burials.

Professor Minor, in his treatise on Real Property, has, we think, drawn an apt analogy.

"There is some conflict of opinion whether the right to occupy a pew in a church is an *easement* and, as such, *real* property, or whether it is to be regarded as *personalty;* but the great weight of authority is in favor of its being an *easement* and *real estate,* * * *

"Upon analogous principles, where one purchases a burial lot in a cemetery, he does not buy the *land itself,* but only the right to use the lot for the purposes for which the land has been dedicated, * * *. Every purchaser of a burial lot is affected with *notice* of the limitations placed upon his holdings by law and by the charter and by-laws of the company holding the title to the land, * * *. Hence the soil may be sold in fee, discharged of all easements, if only the remains resting there be properly and lawfully removed." Minor on Real Property, 2d Ed., Section 126.

■ Petitioner contends that the purchasers of the cemetery lots acquired only

a mere license. We think this contention, here, is lacking in merit. A license differs materially from an easement. It constitutes no interest in land, but is a mere authority, usually revocable at will and is not transferable. The interests here were not revocable, so long as the cemetery remained such, and by express words in the deeds were granted to the purchaser, his heirs and *assigns*.

An easement is the opposite of a license. It is an interest in land, usually irrevocable and freely transferable. See Minor, Real Property, 2nd Ed., Section 92.

From the foregoing it is concluded that, while not a fee, the interest conveyed by petitioner to the purchasers does constitute an easement, an interest or right in land, and as such is real property for purposes of taxation. The Commissioner has long taken the position that the term "real property" is used in Section 44(b) in its usual and common sense and includes sale of rights in land as well as the land itself. G. C. M. 7871, IX-I, C. B. 207 (1930).

The cases relied on by petitioner in its contention that the rights of sepulchre are securities, and as such are personalty, may be easily distinguished and are not applicable.

The decision of the Tax Court is affirmed.

Affirmed.