In accordance with the Memorandum filed this day and incorporated herein by reference,

IT IS HEREBY ORDERED, ADJUDGED, and DECREED that defendant shall have judgment against plaintiff and that plaintiff's complaint is DISMISSED with prejudice. Plaintiff shall pay the costs of this action.

Joseph L. STENDIG and Eileen M. Stendig, Plaintiffs,

v.

UNITED STATES of America, Defendant.

Civ. A. No. 85–0100–D.

United States District Court, W.D. Virginia, Danville Division.

Jan. 14, 1987.

John Y. Merrell, Merrell & Callahan, McLean, Va., for plaintiffs.

John S. Miles, Trial Atty., Tax Div., U.S. Dept. of Justice, Washington, D.C., Jennie L. Montgomery, Asst. U.S. Atty., Roanoke, Va., for defendant.

## MEMORANDUM OPINION

KISER, District Judge.

### I. Introduction

Before the Court for disposition are cross-motions for summary judgment in the above-captioned tax refund matter. The parties have agreed to confer with each other and file a proposed Order of the refunds due Plaintiffs if Plaintiffs' motion is granted. In addition, they have agreed that if Defendant's motion is granted this case should be dismissed with prejudice.

The issue to be resolved is whether certain funds, which Plaintiffs' partnership was required by the Virginia Housing Development Authority (VHDA) to deposit into a Reserve Fund for Replacements (Replacement Reserve), and an Operating Reserve Account (Operating Reserve) were properly includable in the partnership's gross income for the years 1979, 1980, and 1981. Because I have determined that these funds were includable in the partnership's gross income, Defendant's summary judgment motion is granted, and this case is accordingly dismissed.

### II. Factual Background

The parties have stipulated to most of the relevant facts in this case. The Plaintiffs are a husband and wife who, in 1976, formed a limited partnership known as Holiday Village Associates. That partnership constructed and operates a low income apartment complex known as Holiday Village in Danville, Virginia. The financing of the project was through the VHDA, and the apartment development was constructed in three phases of which only Phase I and Phase II are involved in the current lawsuit. Each of these phases was separately financed by VHDA.

In order to obtain VHDA financing, the partnership had to enter into regulatory agreements. The partnership also entered into Housing Assistance Payments Contracts (HAP Contracts) with VHDA, which contracts were approved by the United States Department of Housing and Urban Development (HUD). The regulatory agreements required the establishment of a Replacement Reserve and an Operating Reserve. Paragraphs 6 of the Regulatory Agreements for Phases I and II are identical. That paragraph addresses the Replacement Reserve and provides in relevant part as follows: "Disbursements from such fund, whether for the purpose of effecting replacement of structural elements and mechanical equipment of the Development or for any other purpose, may be made only after receiving the written direction or consent of an Authorized Officer of the Authority." Paragraph 7 of these Agreements addresses the Operating Reserve, and Subparagraph (b) thereunder likewise requires VHDA approval for disbursements. The Operating Reserve may be used for such things as payment of operating expenses, including taxes, maintenance, insurance, and the like; the making of annual limited dividend payments to the developers (Stendigs); and paying for "amenities or design modifications as to the Development which either are necessary or desirable for the marketing of the Development, or will reduce maintenance or replacement costs over a substantial portion of the Mortgage Loan or will benefit a substantial portion of the residents of the Development by providing necessary or desirable social services that will improve the health, educational opportunity, security, and general welfare of such residents, or will make an important contribution to the livability of the Development...."

The books and financial records of the partnership are kept up on a calendar year basis, and the partnership follows an accrual method of accounting. It files its income tax returns in compliance with this record-keeping. During the years at issue here, the Plaintiffs included the amounts used to fund the Replacement Reserve and the Operating Reserve and the interest earned on these funds as income. The results of this are shown on the income tax returns that have been provided as exhibits. Late in 1982, the partnership determined that these amounts should have been excluded from its income and filed amended income tax returns. The Internal Revenue Service re-

fused to allow Plaintiffs' claims for refunds based on these amended returns, and the present lawsuit resulted.

## III. Discussion

In reviewing the arguments and supporting case law advanced by the parties, this Court has found particularly persuasive of Defendant's position a line of cases involving cemeteries and funds established in relation to their care, maintenance, and further development. In *National Memorial Park, Inc. v. Commissioner of Internal Revenue*, 145 F.2d 1008 (4th Cir.1944) [hereinafter *NMP*], the United States Court of Appeals for the Fourth Circuit upheld a decision of the Tax Court against petitioner, a cemetery developer and operator.

The *NMP* case, like others cited from several jurisdictions, involved a trust agreement whereby the trustee received all moneys generated from the sale of burial lots. The agreement provided for the establishment of several separate funds, among which were the Perpetual Maintenance Fund (PMF) and the Improvement Fund (IF). The PMF, as the name implies, was to be utilized for "the perpetual care and preservation of the grounds, and the repair and renewal of the buildings and property." *Id.* at 1010. The IF encompassed the broader purposes of "developing, enlarging, improving and beautifying the Memorial Park" and could be expended for such projects as landscaping, construction, equipment purchases, or other matters deemed "necessary or proper" by the Board of Directors. *Id.* It was upon these funds that the tax dispute focused.

In examining the validity of such trusts as those established by the petitioner, the *NMP* court cited the following test set forth in the case of *American Cemetery Co. v. United States*, 28 F.2d 918 (D. Kansas 1928):

> The rule is this: The moneys derived from the sale of cemetery lots shall be treated as income, and no part of that income may be deducted, for taxation purposes, simply because the cemetery

corporation has made a general agreement for perpetual maintenance....

> If, on the other hand, a trust is created, *and* a taxpayer is bound, either by statute or its agreement, to pay certain sums into a trust fund, *and* if such trust fund is entirely beyond its control, *and* if the principal and income from such trust cannot inure to the benefit of the plaintiff, then the sums paid into the trust are not considered as a part of the plaintiff's income.

*Id.* at 919 [emphasis supplied]. Applying the test, the *NMP* court agreed with the Tax Court that the benefits coming from the IF inured primarily to the petitioner. Under the circumstances, the court found that even were the IF to constitute a valid trust, it was nevertheless taxable income because of its benefit to petitioner; the fund was actually "nothing more than a conduit, channelling the money from the purchaser [of a burial plot] to the beneficial use of the petitioner." 145 F.2d at 1013. The PMF was in a different category because it could not be utilized by petitioner for its benefit but rather was to remain inviolate.

The case of *Angelus Funeral Home v. Commissioner of Internal Revenue*, 407 F.2d 210 (9th Cir.1969), has summarized the cemetery cases as follows:

> [A] line of cases involving cemetery maintenance or perpetual care trusts recognizes that while the primary beneficiaries are the lot or niche purchasers, the cemetery also benefits from good maintenance of its premises; nevertheless, if the payments into the trust fund cannot be used for the corporate purposes of the trustee cemetery, they are shielded from taxation despite the incidental benefit to the cemetery.[2]

But in contrast to the perpetual care trust cases, cemetery owners seeking exemption from taxation for payments into trusts for future capital improvements have had very tough sledding indeed. The court in *Mount Vernon Gardens, Inc. v. Commissioner*, 6 Cir., 1962, 298

F.2d 712, summed up the cemetery owner's problem as follows:

> 'But the creation of a trust into which a portion of the purchase price is paid is not in and of itself sufficient to prevent the trust money from being treated as income.  * * * [T]he decisive feature in each case is the terms and provisions of the particular trust involved.  The questions of control by, and inurement to the benefit of, the taxpayer, are of prime importance.  In [two prior] * * * cases the Court was of the opinion that the trust funds were available under the terms of the trust to promote future capital improvements in the taxpayer's property, was for the taxpayer's benefit, and accordingly, was taxable income. * * '
> (298 F.2d 716.)

The portion of the cemetery lot purchase price in *Mount Vernon* which was allocable to the 'Development Trust Fund' was found to be a part of the cemetery's taxable income.[3]

[2]*Commissioner v. Cedar Park Cemetery Ass'n,* 7 Cir., 1950, 183 F.2d 553; *Portland Cremation Ass'n v. Commissioner,* 9 Cir., 1929, 31 F.2d 843; *Green Lawn Memorial Park, Inc. v. McDonald,* M.D.Pa., 1958, 164 F.Supp. 438, 441, affirmed 3 Cir., 1959, 262 F.2d 588; *American Cemetery Co. v. United States,* D.Kan., 1928, 28 F.2d 918; *Troost Avenue Cemetery Co. v. United States,* W.D.Mo., 1927, 21 F.2d 194; cf. *Oak Woods Cemetery Ass'n v. United States,* 7 Cir., 1965, 345 F.2d 361; *Monte Vista Burial Park, Inc. v. United States,* 6 Cir., 1965, 340 F.2d 595.

[3]Like results have been reached on similar facts in *Jefferson Memorial Gardens, Inc. v. Commissioner,* 5 Cir., 1968, 390 F.2d 161, 167; *Sherwood Memorial Gardens, Inc. v. Commissioner,* 7 Cir., 1965, 350 F.2d 225; *Gracelawn Memorial Park, Inc. v. United States,* 3 Cir., 1958, 260 F.2d 328; *National Memorial Park v. Commissioner,* 4 Cir., 1944, 145 F.2d 1008.

*Id.* at 212–13.

Applying the rationale of *NMP* and other similar cases, I find that the funds the Stendigs were required to establish in order to get VHDA financing are not tax exempt.  It is true that Plaintiffs were required to pay certain amounts into these funds, but it is arguable whether the funds were *entirely* beyond their control.  More importantly, the principal and interest generated from both funds definitely have and will inure to Plaintiffs' benefit.

Of additional persuasiveness to the government's position is the case of *Commissioner of Internal Revenue v. Hansen,* 360 U.S. 446, 79 S.Ct. 1270, 3 L.Ed.2d 1360 (1959).  In *Hansen,* three cases were consolidated for consideration by the Supreme Court.  These cases together involved two automobile dealers and a house trailer dealer, all of whom kept the books of their businesses on an accrual basis and sold the goods in question on time payments.  In each situation, the dealer received a down payment plus a note from the purchaser and then discounted the note to a financial institution, which paid the dealer the amount of the note less a required "Dealers Reserve Account" (DRA).  The dealers/taxpayers claimed that moneys in these DRAs were not income because they were not subject to or under the dealers' control and, in fact, in the year of the sale it could not be determined how much of the DRA a dealer would ultimately receive.  Thus, they further argued, the reserve amounts were not accrued income because the dealers "did not acquire, in the year of any of the sales, a fixed right to receive—in a later year or at any time—the amounts credited to them in the reserves." *Id.* at 449, 79 S.Ct. at 1272.  The Commissioner argued otherwise and proposed to assess deficient tax amounts from the dealers.

The *Hansen* case deals with two important principles.  First, the Court reiterated the principle that when a taxpayer utilizes the accrual method of accounting, the *fixed right to receive* payment rather than *actual receipt* is determinative in discerning the taxpayer's income for tax purposes. *Id.* at 464, 79 S.Ct. at 1280.  The second principle addressed by the Court was that of constructive receipt, and the Court found that money or property is received not only when it goes directly to the taxpayer but also when it goes to a third party for the taxpayer's benefit.  In so finding, the Court noted, "In any realistic view we think that the dealer has 'received' his reserve account whether it is applied, as he

authorized, to the payment of his obligations to the finance company, or is paid to him in cash." *Id.* at 466, 79 S.Ct. at 1281. The Court further stated,

> The taxpayers complain that such a holding will unfairly require them to pay taxes upon funds which are not available to them for that purpose. Though the funds are not presently available to the taxpayers for the payment of taxes, they are nevertheless owned by the taxpayers, and the latter cannot expect to collateralize their liabilities, for periods running from 1 to 5 years, by the use of their accrued but untaxed funds. Moreover, it is a normal result of the accrual basis of accounting and reporting that taxes frequently must be paid on accrued funds before receipt of the cash with which to pay them....

*Id.*

Plaintiffs have argued that *Hansen* is distinguishable from the current matter because *Hansen* involved a two-step transaction: (1) the dealer's receipt of the down payment plus a note from the purchaser, and (2) the subsequent discounting by the dealer of the note to the finance company and receipt back from it of the amount of the note less the dealer reserve. It is true that two steps were involved, but when one cuts through the form of the transaction as distinguished from the substance of it, one sees that basically one transaction was involved in which the purchase price of the vehicle was paid for by a combination of the down payment and the proceeds of the financing.

Another case that addresses some issues that parallel those in the present matter is *United States v. Maryland Jockey Club of Baltimore County*, 210 F.2d 367 (4th Cir. 1954), wherein the United States Court of Appeals for the Fourth Circuit reversed a holding below that granted a refund to the taxpayer/race track operator. Under Maryland law, the taxpayer was required to pay over to the State Racing Commission a percentage of the amounts taken in from pari-mutuel betting at its track. This "Racing Fund" could not be used by the

taxpayer except with the permission of the Commission and the purposes for which fund expenditures could be approved included additions, changes, repairs, and alterations to the property. Any amounts contributed by a taxpayer to the fund and not expended within three years after deposit would automatically revert to the state.

After heavy rainstorms, the taxpayer wanted to rebuild the racing strip, received Commission approval, and was reimbursed from the Racing Fund for the rebuilding expenses. The Fourth Circuit concluded that the reimbursement was income and stated that the fund "represented the taxpayer's own receipts from its own operations, of which it was temporarily deprived of enjoyment but as to which it later realized enjoyment to the extent that the fund was utilized." *Id.* at 370.

The *Jockey Club* rationale is applicable to the present case in that the Racing Fund therein and the two funds in the current situation were funds into which the taxpayers were required to make deposits. Furthermore, expenditures from the funds were restricted to certain designated purposes and no amounts could be withdrawn without express permission of the controlling agency, i.e. the Racing Commission in the *Jockey Club* case or the VHDA in the instant matter. The major difference between *Jockey Club* and the present case is the determination of what constitutes taxable income. In the former situation, although the issue of taxability of the entire fund amount was not raised, the court logically concluded that only the amount actually received by the taxpayer was income. The amount remaining in the fund was not income until receipt because all unspent amounts would go to the state of Maryland within three years of deposit. Thus, the taxpayer was taxed on the funds made available to him. In the current situation, no possibility exists that the State of Virginia, the VHDA, or anyone other than the taxpayers will receive what remains of the funds. Thus, each year the fund amounts, though not completely within the direct

reach of the taxpayers, have accrued to their benefit.

The deposition testimony of J. Judson McKellar, Jr., General Counsel for VHDA, reinforces my conclusions as set forth heretofore. During the time period at issue, Plaintiffs were entitled to annual limited dividends from the Operating Reserve of up to six percent (6%) of their equity in Phases I and II, an amount later raised to 10 percent (10%). McKellar agreed with government counsel's observations that both funds required by the regulatory agreements are devices to secure the duties of the mortgagor to maintain the premises of low cost housing projects, a duty that the mortgagor has even without the existence of the regulatory agreements. McKellar Dep. at 28. That duty arose originally from Paragraph 7 of the deed of trust executed on November 29, 1976, between VHDA and Holiday Village Limited Partnership with regard to Phase I, *id.* at 27, and thus even without reserve funds, the taxpayers would have been obligated to provide maintenance deemed necessary by VHDA. *Id.* at 29.

The deposition testimony of Nina B. Nolley, who was employed as Housing Management Finance Officer for VHDA, further elucidated the manner in which the Replacement Reserve and Operating Reserve accounts are controlled and funded. As noted earlier in my discussion, when the Holiday Village project was begun, HAP agreements were entered into with VHDA and approved by HUD. Simply stated, these agreements provided for supplemental payments from the federal government so that the Holiday Village tenants could have suitable housing at affordable rents. The HAP payments were sent from the federal government to the VHDA on a monthly basis. Upon receipt of these payments, VHDA would deduct the Replacement Reserve and the mortgage payment, as well as insurance and real estate tax escrows, and would forward the balance to the developer for deposit into the Operating Reserve Account. From that point, the Operating Reserve was used by the developer for the purposes stated in the regulatory agreements, and the developer would submit monthly statements to VHDA in which all disbursements from this account were reflected. The statements were reviewed by VHDA to verify that the expenditures were in compliance with the regulatory agreements and if VHDA determined that they were not, the developer would be required to repay the disapproved amounts back into the Operating Account. Nolley Dep. at 14–17.

In summary, the deposition testimony of Nolley, as well as that of Hunter Louis Jacobs, Assistant Director of Housing Management for VHDA, shows that each month the developer receives rent payments directly from his tenants and also receives the balance of the HAP payments made by HUD after they are processed by the VHDA. These are the amounts that are deposited into the Operating Reserve Account, and the developer makes disbursements from these accounts in accordance with the provisions of the regulatory agreements. Thus, it appears that the developer has a great deal of control over the Operating Reserve, does not have to seek prior approval from VHDA for disbursements made from it, and is restricted only to doing what he is obligated to do under the regulatory agreements to which he was a signatory. The basic restriction on the Operating Reserve is that it be used for the specific purposes outlined in the regulatory agreements.

It is certainly true that the Plaintiffs have less control over the Replacement Reserve in contrast to their considerable contact with the Operating Reserve. Nevertheless, as mentioned before, this account was established to make replacements of structural elements and mechanical equipment and subsequently was expanded to include some payments for painting, all of which purposes and uses would be the responsibility of Plaintiffs. Accordingly, the money in this account inures to their benefit by fulfilling their maintenance obligations. Moreover, any remaining amounts at the end of the mortgage term will be theirs.

The record in this case shows that the VHDA has not turned an unsympathetic ear toward the plight of the Plaintiffs with regard to taxes. The deposition testimony of Nolley outlined some of the steps taken by VHDA in order to lessen these problems. In response to being informed that considerable tax income was being generated in the reserve funds, the VHDA attempted to afford some relief by moving some of the funds from the accounts and investing them in securities that were exempt from both state and federal taxes. A letter submitted as Exhibit 3 to Nolley's deposition reflects the understanding reached between the VHDA and Mr. Stendig. As mentioned previously, another step taken by VHDA to lessen the tax problems was to increase the amount of the limited dividend from 6% to 10% per year even though that increase did not apply to the years that are the subject of the current lawsuit.

## IV. Conclusion

In accordance with the foregoing discussion and having carefully reviewed applicable case law, legal principles, and the entire record in this case, including depositions and the numerous exhibits submitted, I have concluded that Defendant's Motion for Summary Judgment should be granted. The funds that Plaintiffs' partnership was required by the VHDA to deposit into the Replacement Reserve and into the Operating Reserve were properly includable in the partnership's gross income for the years 1979, 1980, and 1981.

This case is dismissed, and the Clerk is directed to send a certified copy of this Memorandum Opinion to all counsel of record.