**Joseph L. STENDIG; Eileen M. Stendig, Plaintiffs–Appellants,**

v.

**UNITED STATES of America, Defendant–Appellee.**

**No. 87–3109.**

United States Court of Appeals, Fourth Circuit.

Argued Feb. 3, 1988.

Decided April 5, 1988.

John Yates Merrell (John Yates Merrell, Jr., John C. Donovan, Merrell & Merrell, P.C., on brief), for plaintiffs-appellants.

Kenneth L. Greene, Tax Div., Dept. of Justice (Michael C. Durney, Acting Asst. Atty. Gen., Michael L. Paup, Jonathan S. Cohen, Tax Div., Dept. of Justice, on brief), for defendant-appellee.

Before WIDENER, MURNAGHAN, and SPROUSE, Circuit Judges.

SPROUSE, Circuit Judge:

Joseph L. Stendig and Eileen M. Stendig appeal the district court's judgment in favor of the Internal Revenue Service (IRS) in their action for a refund of taxes paid on income deposited into accounts to secure the maintenance and operation of an apartment complex they built. The district court held that the funds deposited constituted accrued taxable income for the years 1979, 1980, and 1981. We affirm.

I.

The Stendigs are partners in Holiday Village Associates (the partnership), a limited partnership, which constructed and operates a low-income apartment complex (the Development) in Danville, Virginia. The Virginia Housing Development Authority (VHDA) financed the construction of the Development, providing the Stendigs with more than $3 million in nonrecourse loans

---

payable over a forty-year term. To receive the financing, the Stendigs were required to enter standard VHDA regulatory agreements that set forth rules and guidelines for the operation of the Development after completion of construction. The agreements directed the partnership to place all receipts received from rents and other sources into specified interest-bearing accounts and restricted the partnership's access to the deposited funds and the uses to which they could be put.

At issue in this case is the question whether receipts placed into two accounts (the replacement and operating reserve) constituted accrued income to the partnership in the years of their deposit. Paragraph 6 of the agreements required the partnership to establish a "Reserve Fund for Replacements" (replacement reserve), to be funded by fixed monthly deposits of amounts determined by the VHDA. It provided in pertinent part:

> Disbursements from such fund, whether for the purpose of effecting replacement of structural elements and mechanical equipment of the Development or for any other purpose, may be made only after receiving the written direction or consent of an Authorized Officer of the Authority. In the event of a default in the terms of the Deed of Trust pursuant to which the Mortgage Loan has been accelerated, the Authority may apply or authorize the application of the balance in such fund to the amount due on the Mortgage Loan as accelerated.

Paragraphs 16 and 7 of the regulatory agreements respectively required the partnership to establish an operating account and an operating reserve account. On receipt, all rents and other receipts were deposited into the operating account, which funded the day-to-day operation of the Development and served as the source for an annual dividend to the partnership. Pursuant to Paragraph 7, all residual funds in the operating account and other accounts not relevant to this appeal were deposited annually into an operating reserve account. The operating reserve, in turn, could be used to pay: (i) the Development's outstanding operating expenses; (ii) the partnership's annual dividend; and,

> ... (iii) amenities or design modifications as to the Development which either are necessary or desirable for the marketing of the Development, or will reduce maintenance or replacement costs over a substantial portion of the term of the Mortgage Loan, or will benefit a substantial portion of the residents of the Development by providing necessary or desirable social services that will improve the health, educational opportunity, security and general welfare of such residents, or will make an important contribution to the livability of the Development....

Under the terms of the agreements, the VHDA must approve the partnership's withdrawal of funds from the operating and replacement reserve accounts, and the VHDA has authority to draw on the funds unilaterally for the purposes specified above. Both accounts, however, earn interest and, after the mortgages are paid, they will be turned over to the partnership. At that time, of course, the partnership will have no further obligation to maintain the reserve accounts or to submit to the VHDA's controls.

In the tax years 1977 through 1981, the partnership included the amounts deposited in the reserve accounts and the interest thereon in their gross reported income. In 1982, however, the partnership amended its returns for 1979, 1980, and 1981 to exclude deposits made into the two reserve accounts, and it claimed a refund based on its proportionately increased losses. After the Commissioner denied the partnership's refund claim, the Stendigs brought this action, in which they contended that the funds could not be considered partnership income until the VHDA was divested of control over their disposition.

Ruling on stipulated facts, the district court entered summary judgment in favor of the Commissioner, holding that the amounts deposited in the reserve accounts constituted accrued taxable income in the years of their deposit. *Stendig v. United States*, 651 F.Supp. 1193 (W.D.Va.), *modified*, 669 F.Supp. 136 (1987). The court

relied principally on our decision in *National Memorial Park, Inc. v. Commissioner*, 145 F.2d 1008 (4th Cir.1944), *cert. denied*, 324 U.S. 858, 65 S.Ct. 861, 89 L.Ed. 1416 (1945), wherein we applied the following test for determining whether cemetery owners could exclude from taxable income monies allocated to a cemetery improvement fund:

'[i]f ... a trust is created, and taxpayer is bound, either by statute or its agreement, to pay certain sums into a trust fund, and if such trust fund is entirely beyond its control, *and if the principal and income from such trust cannot inure to the benefit of the plaintiff*, then the sums paid into the trust are not considered as a part of the plaintiff's income.'

*Id.* at 1012 (quoting *American Cemetery Co. v. United States*, 28 F.2d 918, 919 (D.Kan.1928)) (emphasis supplied). Since the Stendigs failed to show that the funds deposited in the reserve accounts could not inure to their benefit, the court determined they had accrued as income taxable to the partnership. *Stendig*, 669 F.Supp. at 138.

## II.

The Stendigs contend on appeal that *National Memorial Park* is distinguishable from this case because here the VHDA exercises complete control over the funds in the reserve accounts and may unilaterally elect to spend part or all of them before the termination of the partnership's mortgage obligation. They argue that these differences compel the conclusion that the funds are not includable as accrued taxable income. While we agree that the situation presented in *National Memorial Park* is not strictly analogous to that presented here,[1] we conclude that the trial court correctly determined that the funds in question constitute taxable income.

Since the partnership maintained its books using the accrual method of accounting, the principal tax question we must decide is whether in the tax years at issue the partnership acquired the *"fixed right to receive* the [funds deposited in the] reserves." *Commissioner v. Hansen*, 360 U.S. 446, 464, 79 S.Ct. 1270, 1280, 3 L.Ed.2d 1360 (1959) (emphasis in original). In *Hansen*, of course, the Supreme Court reaffirmed the uncontroverted rule that it is the right to receive accrual basis income, not its actual receipt, that determines the time of its inclusion as gross income. *Id.*;[2] *see Spring City Foundry Co. v. Commissioner*, 292 U.S. 182, 184–85, 54 S.Ct. 644,

---

1. The issue we considered in *National Memorial Park* was "whether as a matter of law, and for the purposes of federal income taxes, a valid trust was established and carried out by [the taxpayer]." 145 F.2d at 1012. As in most trust cases, the degree of control exercised by the *cestui que trust* over the corpus was a critical factor in our determination of the validity of the trust. While the reserve accounts created by the regulatory agreements in this case bear some similarities to trusts, they obviously are not trusts.

2. In *Hansen*, the Court determined that amounts held in automobile dealers' reserve accounts must be reported as accrued income. The accounts were created by financial institutions who purchased installment notes executed by automobile purchasers in favor of the dealers. The financial institutions retained a percentage of the face value of the notes from the dealers as collateral to secure the purchasers' repayment obligations. The dealers contended, as do the Stendigs here, that the amounts retained in the reserve accounts were subject to contingencies such that it could not be known how much,

if any, of the reserves would ever be received by them. The dealers maintained therefore that they did not obtain a fixed right to receive the reserve accounts and these did not qualify as accrued income to them.

In his decision for the Eighth Circuit in *Bolling v. Commissioner*, 357 F.2d 3 (8th Cir.1966), Judge Blackmun (prior to his elevation to the Supreme Court) summarized the Court's holdings in *Hansen* as follows:

The Supreme Court held ... that (a) the fact the dealer could not presently compel the finance company to pay over the reserve did not negate the existence of a fixed right to receive the reserved amount ... (b) the existence of contingent liabilities on the part of the dealer to the finance company, to which the reserve was subject, did not deny the existence of a fixed right to receive, for any use of the reserve in payment of those obligations would amount to something received by the dealer; and (c) income therefore accrued when the amounts withheld were entered on the books of the finance companies as liabilities to the dealers.

*Id.* at 6.

644–45, 78 L.Ed. 1200 (1934) ("When the right to receive an amount becomes fixed, the right accrues."); *Flamingo Resort, Inc. v. United States,* 664 F.2d 1387, 1390 (9th Cir.), *cert. denied,* 459 U.S. 1036, 103 S.Ct. 446, 74 L.Ed.2d 602 (1982) (a right to receive income is "fixed" if there is a reasonable expectation of receiving it). Here, we think the Stendigs acquired a fixed right to receive the funds in the reserve accounts in the years of their deposit.

Beyond mere speculation and surmise, the Stendigs have offered nothing to indicate that they will not ultimately recover the deposited funds,[3] and we are aware of no basis in law or equity to defer the Stendigs' tax liability until the time of actual receipt.[4] Although actual receipt will be delayed until the termination of the partnership's mortgage obligation, "it is a normal result of the accrual basis of accounting and reporting that taxes frequently must be paid on accrued funds before receipt of the cash with which to pay them." *Hansen,* 360 U.S. at 466–67, 79 S.Ct. at 1281. We further observe that rents and rent subsidies received from or on behalf of the Development's tenants constitute the principal sources of funds deposited in the reserve accounts.[5] These sources reflect a substantial portion of the income the partnership could expect to receive as a result

of its venture. It is simply inconceivable that the Stendigs would have embarked on this long-term investment without the reasonable expectation of receiving the bulk of income it generated. *See Flamingo Resort, Inc.,* 664 F.2d at 1390.

The Stendigs argue nonetheless that the reserve funds should not be considered income because the VHDA may deplete the reserve accounts during the term of the loan. Under the circumstances presented here, we cannot accept that argument. First, the VHDA's temporary control over the disposition of the funds is but a consequence of the Stendigs' voluntary election to obtain the financial advantages that low income housing investments such as these provide.[6] *Cf. Hansen,* 360 U.S. at 465–66, 79 S.Ct. at 1280–81 (accrued income taxable notwithstanding taxpayers' voluntarily assumed obligation that may result in its forfeit). We are also persuaded that the partnership retains substantial influence over decisions concerning expenditures from the reserves and that such expenditures, if they occur at all, will inure to the partnership's benefit.

The replacement reserve account, as defined in Paragraph 6 of the agreements, exists to secure the partnership's nonrecourse mortgage obligation. It accomplishes this purpose by limiting disburse-

---

3. In deposition testimony and in oral argument the Stendigs admitted that to date no monies have been expended from either reserve account.

4. *Cf. Bolling,* 357 F.2d at 5 (8th Cir.1966) ("predicted uncollectibility, no matter how certain, does not affect a creditor's right to receive payment and, consequently, its obligation to accrue and include in gross income," construing *Spring City Foundry Co.,* 292 U.S. 182, 54 S.Ct. 644, 78 L.Ed. 1200 (1934)).

5. Although the Development's tenants paid rent directly to the partnership, the VHDA determined the amount of the rents charged. Thirty percent of the rental units were set aside for very low income tenants whose rents were subsidized by the Department of Housing and Urban Development (HUD). If a tenant's rent was subsidized, HUD paid the subsidy directly to the VHDA. Upon receipt of HUD payments, the VHDA deducted the partnership's monthly mortgage payment, real estate taxes, and the specified amounts to be deposited in the re-

placement reserve account. The balance was remitted to the partnership, which in turn deposited the receipts into the Development's operating account.

6. Although disputed, the specific financial advantages received by the Stendigs as a result of their investment are not strictly relevant to the issues in this appeal. It is material, however, that the Stendigs structured the transaction to receive these benefits, temporarily relinquishing possession of income that under other circumstances would be available for their immediate use. Viewed in this context, the Stendigs concede they received double depreciation benefits and accelerated deduction of the costs of financing (interest), but maintain that the amount of these benefits declines over the life of the mortgage. The government observes that the Stendigs' arrangement has resulted in losses over and above all income received from the Development (including the amounts deposited into the reserve funds) and that the Stendigs have deducted the *surplus losses from income* derived from other sources.

ments from the account to those that provide for replacement of structural elements and mechanical equipment at the Development—thereby ensuring the apartments' rentability—, and those that repay the partnership's loan in the event of default. The Stendigs obviously would obtain a direct benefit from either of these types of expenditures. Moreover, they possess a substantial degree of control over the events that would permit the VHDA to authorize them. Finally, the replacement reserve's function as a loan guaranty is largely identical to that of the reserve fund, which the Supreme Court in *Hansen* determined to be accrued taxable income. *See generally id.* and *supra* note 2.[7]

Paragraph 7 likewise restricts disbursements from the operating reserve to costs and expenses whose payment would redound principally to the benefit of the partnership. It allows for payment of the Development's operating expenses, the partnership's annual dividend, and similar to the replacement reserve, it may be used to fund "amenities or design modifications ... which either are necessary or desirable for the marketing of the Development, or will reduce maintenance or replacement costs over a substantial portion of the term of the Mortgage Loan...."

Although all of these permitted expenditures would obviously benefit the partnership or increase the value of its property, the Stendigs argue that the VHDA could seize upon remaining language in Paragraph 7 to authorize disbursements for purely fanciful amenities such as swimming pools, which would not benefit the partnership. Without an evidentiary basis, however, we cannot assume that the VHDA will initiate irresponsible programs simply to suit the fancy of some tenants.[8] Beyond the fact that we have been provid-

ed no indication that the VHDA has even considered such action, were it to happen, we have no doubt that the taxpayers would justifiably seek·exclusion of those expenditures from their taxable income.[9] In summary, we do not think that the remote possibility of nonbeneficial expenditures constitutes sufficient reason to exclude the entire operating reserve from the partnership's accrued taxable income.

In their final argument, the Stendigs maintain that the district court ignored the "claim of right" doctrine, which they say is of paramount importance to the appropriate disposition of this case. In this context, the Stendigs distill from a treasury regulation and various judicial formulations of the doctrine a four-part test for determining when accrual basis taxpayers acquire the right to receive income. They argue that they fail the test they designed. We cannot accept the test or the argument.

The claim of right doctrine has no bearing on the question presented here. The doctrine simply holds that income *already received or accrued* under a claim of right is taxable notwithstanding that the taxpayer's right to the underlying funds is subject to dispute. *See United States v. Skelly Oil Co.*, 394 U.S. 678, 680–81, 89 S.Ct. 1379, 1381, 22 L.Ed.2d 642 (1969); *North American Oil Consolidated v. Burnet*, 286 U.S. 417, 424, 52 S.Ct. 613, 615, 76 L.Ed. 1197 (1932). Here the Stendigs' right to the reserve funds has accrued, and it is not disputed by anyone other than themselves.

In view of the above, the judgment of the district court is affirmed.

AFFIRMED.

---

7. *Accord Bolling*, 357 F.2d at 8 (home builders and sellers acting as loan guarantors for customers are required to report as accrued income sales proceeds pledged as loan security to lender).

8. Paragraph 7 allows for expenditure of funds from the operating reserve for "social services that will improve the health, educational opportunity, security and general welfare of [the Development's] residents, or will make an impor-

tant contribution to the livability of the Development." It appears to us that some social services of this type may well be necessary to maintain the value of the rental property.

9. The government concedes in its brief that "the partnership presumably would be entitled to deductions for expenditures made from the reserve accounts."