132 T.C. No. 2

UNITED STATES TAX COURT

TRINITY INDUSTRIES, INC. AND SUBSIDIARIES, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 12395-06.                    Filed January 28, 2009.

Company T, a member of P's affiliated group,
contracted to build barges for two established
customers; pursuant to an interim financing
arrangement, part of the purchase price was deferred
until 18 months after the delivery of each barge.  The
two customers later claimed damages from alleged
defects in barges that they had previously purchased
from T under earlier contracts; they withheld deferred
payments due under the later contract, asserting common
law rights to offset the deferred payments against
their claimed damages under the earlier contracts.  In
reporting the affiliated group's 2002 consolidated
income, P accrued only the payments actually received
in 2002 and excluded the deferred payments.  <u>Held</u>, the
full contract price of the barges delivered in 2002
must be accrued that year; accrual is not postponed by
the purchasers' assertion of rights to withhold
deferred payments under common law claims of offset.
<u>Held</u>, <u>further</u>, amounts due to T and withheld by the

obligors pursuant to common law claims of offset are
not deductible in 2002 pursuant to sec. 461(f), I.R.C.

Michael L. Cook, Jeffry M. Blair, and William C. Brooks, for petitioner.

George E. Gasper and Garrett D. Gregory, for respondent.

THORNTON, Judge:  Trinity Industries, Inc. (petitioner), is the common parent of an affiliated group of corporations making a consolidated return of income (the affiliated group).[1]  By notice of deficiency, respondent determined a $5,900,808 deficiency for petitioner's taxable year ending March 31, 1999.[2]  All but one of the adjustments that gave rise to that deficiency have been settled.  The only remaining issue involves accrual of income earned by petitioner's wholly owned subsidiary, Trinity Marine Products, Inc. (Trinity), for the taxable year ending December 31, 2002.

More particularly, in 2002 Trinity contracted to build barges for two established customers.  Part of the purchase price

--------

[1] The parties use the term "petitioner" to refer principally to Trinity Industries, Inc., although they sometimes seem to use the term also to refer, without distinction, to its affiliated group of corporations or its wholly owned subsidiary, Trinity Marine Products, Inc.  For simplicity and convenience, we have generally adhered to the terminology used in the parties' stipulations and arguments.

[2] In September 2001, petitioner changed its yearend from Mar. 31 to Dec. 31.

was deferred until 18 months after the delivery of each barge. The two customers later claimed damages allegedly caused by defects in barges that they had previously purchased from Trinity under earlier contracts. They sought to offset their unpaid deferred obligations under the later contract against claimed damages arising under the earlier contracts.

For the taxable year ending December 31, 2002, Trinity was included in petitioner's consolidated U.S. corporate income tax return. Petitioner, an accrual basis taxpayer, included in the affiliated group's 2002 consolidated income payments received for barges that Trinity delivered in 2002 but excluded the deferred payments. In the notice of deficiency, respondent determined that petitioner's failure to accrue the deferred payments in 2002 resulted in an understatement of the affiliated group's 2002 consolidated income which contributed to an overstatement of the 2002 consolidated net operating loss that petitioner had carried back to the 1999 consolidated return. The issues for decision are: (1) Whether petitioner properly excluded the withheld payments from its 2002 income; and (2) if petitioner was required to accrue the withheld payments in 2002, whether it may deduct the withheld payments in 2002 pursuant to section 461(f).[3]

---

[3] Unless otherwise indicated, section references are to the Internal Revenue Code in effect for the year at issue, and Rule references are to the Tax Court Rules of Practice and Procedure.

FINDINGS OF FACT

The parties have stipulated some facts, which we find accordingly, except as otherwise noted. When it petitioned the Court, petitioner's principal place of business was in Texas.

Petitioner is a diversified industrial company engaged in the manufacture, marketing, and leasing of various products. Trinity manufactures inland barges, primarily for commercial marine transportation companies.

The First Contracts With Flowers and Florida Marine

In the late 1990s Trinity entered into a series of contracts to build barges for J. Russell Flowers, Inc. (Flowers), and, separately, for Florida Marine Transporters, Inc. (Florida Marine) (hereinafter we sometimes refer to these contracts collectively as the first contracts). Payment under these contracts was generally due upon delivery of each barge.[4] Trinity delivered the barges to Flowers and Florida Marine on various dates between September 1997 and March 2000. Petitioner

---

[4] The parties have stipulated that a portion of the purchase price of the barges delivered to J. Russell Flowers, Inc. (Flowers), under the first contracts was deferred for 18 months as part of an interim financing arrangement. The stipulated contract which is in evidence provides, however, that the $265,000 contract price for each barge delivered to Flowers was due within 10 days of the invoice date; an invoice was to be issued upon installation of the covers for each vessel. Because the stipulation is clearly contrary to the facts established by the stipulated contract, we shall disregard the stipulation. See Cal-Maine Foods, Inc. v. Commissioner, 93 T.C. 181, 195 (1989).

accrued and reported the sales income in the taxable year in which Trinity delivered the barges.

The Second Contract With Flowers and Florida Marine

On May 22, 2000, after the delivery and acceptance of the barges that were the subject of the first contracts, Trinity entered into another contract (the second contract) with Flowers and Florida Marine. Under the second contract, Trinity, as builder, agreed to deliver certain barges to Flowers, as purchaser; Flowers had the right to assign its contractual rights to Florida Marine (which was also a signatory to the contract) with respect to a specified number of the barges.

The contract price was generally $1,290,000 for each barge, with $1 million to be paid upon completion and acceptance of each barge. The contract provided for "interim financing" of the $290,000 balance, which the purchaser was to pay to Trinity, with interest, within 18 months of delivery of each barge.[5] Pursuant to the second contract, Trinity built numerous barges and delivered them to either Flowers or Florida Marine at various times between April 2001 and September 2002.

---

[5] A contract addendum dated Mar. 19, 2001, provided that Trinity would provide two additional barges for $841,000 each, with $651,000 payable upon completion and acceptance of each barge and payment of the $190,000 balance deferred for 18 months pursuant to an "interim financing" provision. Another contract addendum dated May 16, 2002, provided for an additional six barges for $1,353,000 each, with payment due in full upon delivery of each barge.

Problems With Barges Sold Under the First Contracts

After the execution of the second contract, problems developed with the barges that Trinity had sold to Flowers and Florida Marine under the first contracts. Flowers and Florida Marine complained that the coatings on the barges were defective and caused the barges to rust. Trinity denied any liability concerning this alleged defect.

The Florida Marine Litigation

On May 15, 2002, Florida Marine filed a petition for an unspecified amount of damages in the 22d Judicial Court, St. Tammany Parish, Louisiana, against petitioner, Trinity, a coating manufacturer, a coating distributor, and three insurance companies (the Trinity defendants). On March 20, 2003, Florida Marine filed a motion for leave to file a second supplemental and amending petition for damages, requesting declaratory judgment that it was entitled to offset unpaid deferred obligations under the second contract against Florida Marine's claim for damages with respect to barges purchased under the first contracts.

In its memorandum in support of the aforementioned motion, filed concurrently with the motion, Florida Marine stated that it "does not dispute that certain amounts are due Trinity" pursuant to the second contract but indicated that Florida Marine and Trinity disagreed as to when the deferred payments were due. The memorandum stated that Florida Marine had placed in escrow the

amounts that Trinity had claimed were past due.  The memorandum indicated that the declaratory judgment action would enable the court to declare the rights of Flowers Marine to a "set off and/or credit for amounts, if any, owed by Florida Marine and to Trinity * * * under the * * * [second contract] against such amounts as Trinity * * * may be indebted to Florida Marine * * * under claims which are the subject of the principal action."

In their opposition to Florida Marine's motion the Trinity defendants argued that Florida Marine's motion should be denied because, among other reasons, applicable Louisiana law would not permit Florida Marine's obligations under the second contract to be offset against its claim for damages with respect to barges purchased under the first contracts, which were "contingent, uncertain, and contested".[6]

## The Flowers Litigation

On October 7, 2002, Flowers filed a complaint in the U.S. District Court for the Northern District of Mississippi, Greeneville Division, against petitioner, Trinity, a coating manufacturer, and a coating distributor.  In its complaint Flowers sought an order of rescission whereby Trinity would be required to repurchase from Flowers 56 barges sold under the

---

[6] The record does not reveal the disposition of Florida Marine's motion for leave to file a second supplemental and amending petition for damages.

first contracts for $13,977,578 less an "offset credit" of $8,020,000 for deferred principal payments that it owed Trinity under the second contract. Alternatively, the complaint sought actual damages of not less than $8,400,000 plus punitive damages of $100 million. The complaint also sought a declaratory judgment that Flowers was entitled to exercise its "common law right of offset" with respect to "$8,020,000 it owes to Trinity" as deferred installment payments on barge sales under the second contract, plus accrued interest. The complaint stated that Flowers would "set aside the amounts of the deferred payments in a segregated investment account as each installment and the interest accruals become due. It will then hold said segregated account as collateral security for and as an offset against any amounts that may be due * * * [Flowers] from Trinity as a result of the allegations contained in this Complaint."

Attached as an exhibit to Flowers's complaint was a letter from Flowers dated October 7, 2002, to Trinity whereby Flowers proposed rescinding the first contracts with respect to the 56 allegedly defective barges. The letter stated that if Trinity declined this tender offer, Flowers would "protect itself by exercising its common law right of offset with respect to $8,020,000 in deferred installment payments" that it owed Trinity under the second contract. The letter stated that as each of the installments came due, Flowers would deposit the principal and

accrued interest in a segregated investment account to be "held as an offset against and as collateral security for" damages alleged in the complaint. Alternatively, the letter stated that if Trinity accepted the tender offer, the offset and segregated account would be "reversed" and that Flowers would then pay the deferred installments as they came due.[7]

On October 9, 2003, Trinity filed a motion for partial summary judgment, arguing that Flowers's claim for setoff was improper because, among other reasons, Flowers's "highly contested" claim for unliquidated damages was not currently due and payable, and Trinity would "<u>never</u> owe" Flowers damages in regards to the barges sold under the first contracts. By order dated March 18, 2004, the District Court denied Trinity's motion for summary judgment.

Withholding of Deferred Payments

During 2002, 2003, and 2004 deferred payments fell due from Flowers and Florida Marine with respect to barges that Trinity had delivered to them under the second contract in 2001 and 2002. Because the deferred payments were due 18 months after delivery, however, deferred payments for barges delivered in 2002 fell due

---

[7] The letter further stated that the aforementioned complaint had been filed in the U.S. District Court for the Northern District of Mississippi, Greeneville Division, but that service on the defendants had been deferred 30 days to give Trinity an opportunity to respond to Flowers' tender offer.

only during 2003 and 2004. The parties have stipulated that Flowers withheld total payments of $8,020,000, of which $2,320,000 was attributable to barges delivered in 2002.[8] The parties have also stipulated that Florida Marine withheld additional total payments of $2,836,060, of which $2,200,000 was attributable to barges delivered in 2002.[9]

Settlement Agreement With Florida Marine

On March 12, 2004, Trinity and Florida Marine entered into a settlement agreement. In compromise of the disputed claims, Trinity agreed to credit Florida Marine with the $2,200,000 of unpaid deferred obligations as to which Florida Marine had asserted a right of offset. Florida Marine agreed to pay Trinity

---

[8] The $2,320,000, which apparently does not include accrued interest, represents eight deferred payments of $290,000 each, with the earliest falling due on Aug. 18, 2003, and the latest on Mar. 13, 2004. The remaining $5,700,000 of deferred payments relates to barges delivered in 2001 pursuant to the second contract. The record does not reveal the exact dates on which these last-mentioned deferred payments fell due or more particularly what portion of these withheld payments might have fallen due in 2002.

[9] The $2,200,000, which apparently does not include accrued interest, represents 11 deferred payments of $200,000 each, with the earliest falling due on Sept. 1, 2003, and the latest on Feb. 8, 2004. The record does not reveal why these deferred payment amounts differ from the $290,000 deferred payments specified under the second contract. The remaining $636,060 of deferred payments relates to barges delivered in 2001 pursuant to the second contract. The record does not reveal the exact dates on which these last-mentioned deferred payments fell due or more particularly what portion of these withheld payments might have fallen due in 2002.

the remaining $617,400 balance over 12 months.[10]  Trinity further agreed to repair specified barges sold to Florida Marine under the first contracts.

Settlement Agreement With Flowers

On April 28, 2005, Trinity and Flowers entered into a settlement agreement.  Trinity agreed to repurchase certain barges sold to Flowers under the first contracts and to pay Flowers $5,764,000 in damages.  Flowers agreed to pay Trinity the $8,020,000 it withheld under the second contract.  The settlement agreement specified that this amount was to be offset by the agreed-upon damages, resulting in a payment from Flowers to Trinity of $2,256,000.

Income Tax Reporting

Petitioner used the accrual method of accounting for all relevant periods.  With respect to barges delivered under the second contract in 2001, petitioner accrued the full amount of the sales, including deferred payments, and reported these amounts as income in 2001.[11]  With respect to barges delivered under the second contract in 2002, however, petitioner reported

---

[10] The record does not reveal why the $2,817,400 balance due reflected in the settlement agreement differs from the $2,836,060 that the parties have stipulated Florida Marine withheld from Trinity.

[11] Petitioner subsequently made an informal claim with the IRS to reduce its 2001 income, which the IRS denied.  This claim is not at issue in this case.

as income only the amounts received during 2002; it excluded the $4,520,000 of deferred payments as to which Florida Marine and Flowers asserted rights of offset.

Notice of Deficiency

In the notice of deficiency respondent determined that failure to accrue the deferred payments for the barges delivered in 2002 under the second contract resulted in a $4,520,000 understatement of the affiliated group's 2002 consolidated income and a corresponding overstatement of the 2002 consolidated net operating loss carryback claimed on petitioner's consolidated return for the taxable year ending March 31, 1999.

OPINION

1.  Accrual Method of Accounting

The primary issue is whether petitioner, as an accrual basis taxpayer, was required to accrue in 2002 deferred payments for barges that Trinity delivered under the second contract in 2002, with respect to which the obligors claimed rights of offset for damages allegedly arising with respect to barges that they had previously purchased under the first contracts.

Under the accrual method of accounting, income is generally recognized when all the events have occurred that fix the right to receive the income, and the amount of the income can be determined with reasonable accuracy.  Secs. 1.446-1(c)(1)(ii)(A), 1.451-1(a), Income Tax Regs.  Consequently, "An accrual basis

taxpayer * * * must report income in the taxable year in which the last event occurs which unconditionally fixes the right to receive the income and there is a reasonable expectancy that the right will be converted to money." Schlumberger Technology Co. v. United States, 195 F.3d 216, 219 (5th Cir. 1999); see Charles Schwab Corp. & Includable Subs. v. Commissioner, 107 T.C. 282, 292 (1996), affd. 161 F.3d 1231 (9th Cir. 1998).

Trinity's delivery of each barge to Flowers or Florida Marine unconditionally fixed its right to receive the full contract price under the second contract. Absent the offset claims by Flowers and Florida Marine, there would appear to be no dispute that petitioner was required to accrue the full contract price of each barge, including deferred payments, in the year of delivery. Indeed, that is the way petitioner reported its consolidated income with respect to barges delivered under the second contract in 2001, before Flowers and Florida Marine asserted their offset claims.

For barges delivered under the second contract in 2002, on the other hand, petitioner accrued only the payments received upon delivery and excluded the deferred payments.[12] Petitioner

---

[12] In the amended answer, filed after trial upon the granting of respondent's motion to conform pleadings to proof pursuant to Rule 41(b), respondent asserts that petitioner improperly changed its accounting method with respect to barges delivered in 2002 pursuant to the second contract. Petitioner
(continued...)

contends that it was not required to accrue these deferred payments in 2002 because of Florida Marine's and Flowers' claims of rights to offset the deferred payments under the second contract against damages allegedly arising under the first contracts. Petitioner relies upon a line of cases which stands generally for the proposition that in certain circumstances an accrual basis taxpayer need not accrue unpaid income if the obligor disputes the validity of the claim. See, e.g., N. Am. Oil Consol. v. Burnet, 286 U.S. 417 (1932); Gar Wood Indus., Inc. v. United States, 437 F.2d 558 (6th Cir. 1971); Cold Metal Process Co. v. Commissioner, 17 T.C. 916 (1951), affd. per order 53-1 USTC par. 9135 (6th Cir. 1952); Jamaica Water Supply Co. v. Commissioner, 42 B.T.A. 359 (1940), affd. 125 F.2d 512 (2d Cir. 1942); Ryan v. Commissioner, T.C. Memo. 1988-12, affd. sub nom. Lamm v. Commissioner, 873 F.2d 194 (8th Cir. 1989); Breeze Corps. v. United States, 127 Ct. Cl. 261, 117 F. Supp. 404 (1954).

For instance, in Gar Wood Indus., Inc. v. United States, supra, upon which petitioner places particular reliance, the taxpayer manufactured equipment for the U.S. Army Corps of

---

[12](...continued)
replies that it did not change its method of accounting in 2002 because the dispute with the purchasers represented a change in underlying facts within the meaning of sec. 1.446-1(e)(2)(ii)(b), Income Tax Regs. Because we conclude that petitioner was required to accrue the disputed income in 2002, it is unnecessary to decide this issue.

Engineers (Corps).  The contracts contained "price redetermination" clauses, which authorized renegotiation of the contracts after partial performance.  Id. at 559.  When certain of the contracts were nearing completion, the Corps, anticipating a price redetermination, unilaterally began withholding amounts otherwise due to the taxpayer under the contracts.  The pricing dispute was resolved 2 years later.  The court held that the taxpayer was not required to accrue the withheld amounts in the year the withholding occurred because the taxpayer "never had a fixed right to the full contract price" and the Corps' refusal to honor the contract price negated whatever right the taxpayer otherwise had to receive the withheld amounts.  Id. at 561.  Similarly, all the other cases upon which petitioner relies involve situations in which obligors disputed the fact or amount of their liability with respect to the item to be accrued.

By contrast, insofar as the record shows, neither Flowers nor Florida Marine ever disputed the fact or amount of its obligation to Trinity under the second contract.  To the contrary, their filings in the commercial litigation expressly acknowledged their obligations to Trinity under the second contract and indicated that they were setting the withheld amounts aside in "escrow" or as "collateral security" to offset whatever damages Trinity might ultimately be determined to owe them with respect to their claims under the first contracts.

In Commissioner v. Hansen, 360 U.S. 446 (1959), the Supreme Court considered a somewhat analogous situation in which buyers withheld a portion of the sales price to satisfy potential claims against the taxpayer seller. More particularly, in Hansen auto dealers entered into a financing arrangement whereby they sold customers' installment notes to finance companies, which withheld a portion of the purchase price as security to cover possible losses on the notes. The Supreme Court held that the auto dealers were required to accrue the withheld amounts as income when the notes were sold. The Court rejected the dealers' argument that accrual was excused by their present inability to compel the finance companies to pay them the reserved amounts. "[T]he question is not whether the taxpayers can presently recover their reserves, for * * * it is the time of acquisition of the fixed right to receive the reserves and not the time of their actual receipt that determines whether or not the reserves have accrued and are taxable." Id. at 464.

The Court noted that although the reserves were subject to being offset by the dealers' contingent liabilities to the finance company, "only the obligations * * * arising from those liabilities may be offset against a like amount in the dealer's reserve account." Id. at 465. Consequently, the Court reasoned, any use of the reserves in paying those obligations would amount to the dealers' receiving something of value. The Court stated:

"In any realistic view we think that the dealer has 'received' his reserve account whether it is applied, as he authorized, to the payment of his obligations to the finance company, or is paid to him in cash."  Id. at 466.  The Court concluded that the dealers must contemporaneously accrue the withheld amounts, even if those funds were not available for paying the resulting tax liability, stating:  "it is a normal result of the accrual basis of accounting and reporting that taxes frequently must be paid on accrued funds before receipt of the cash with which to pay them".  Id. at 466-467; see also Stendig v. United States, 843 F.2d 163 (4th Cir. 1988) (requiring the taxpayer to accrue rents received from its apartment complex, including a portion that was deposited into reserve accounts to secure the maintenance and operation of the complex); Clark v. Woodward Constr. Co., 179 F.2d 176 (10th Cir. 1950) (requiring the taxpayer to accrue income from highway construction contracts when the State accepted the work, notwithstanding a contractual provision which permitted the State, after accepting the work, to withhold 15 percent of the contract price pending publication of statutory notice to any claimants against the taxpayer).

The instant case presents a stronger argument, we believe, for requiring accrual of income than Commissioner v. Hansen, supra, or the other cases just cited.  Unlike these other cases, the instant case does not involve any question as to whether the

right to receive income was vitiated by a contractual provision for withholding a portion of the sales price. Rather, as previously discussed, under the second contract petitioner had a fixed and absolute right to the deferred payments as soon as each barge was delivered. Pursuant to the claims of offset asserted by Flowers and Florida Marine, the withheld payments were to be applied only in satisfaction of Trinity's or petitioner's alleged obligations to them arising under the first contracts. Petitioner effectively received the withheld amounts when, pursuant to the settlement agreement, they were applied in compromise of Flowers' and Florida Marine's claims. In the final analysis, then, the offset claims affected only the timing of petitioner's receipt of income under the second contract and not its right to receive the income.

Petitioner's contentions might be broadly construed as turning upon doubts as to the collectibility of Flowers' and Florida Marine's debts for the deferred payments. Petitioner does not contend that it is entitled to a bad debt deduction with respect to these debts and has offered no proof that the debts were wholly or partially worthless so as to meet the requirements under section 166 for claiming a bad debt deduction. Nevertheless, petitioner seems to suggest broadly that, apart from any question about deductions, doubts about the collectibility of the debts justify postponing the accrual of the

income.  In Spring City Foundry Co. v. Commissioner, 292 U.S. 182, 184 (1934), the Supreme Court squarely rejected such a contention as having "no merit".  The Court stated:

> Keeping accounts and making returns on the accrual basis, as distinguished from the cash basis, import that it is the right to receive and not the actual receipt that determines the inclusion of the amount in gross income.  When the right to receive an amount becomes fixed, the right accrues.  * * *
>
> * * * If such accounts receivable become uncollectible, in whole or part, the question is one of the deduction which may be taken according to the applicable statute. * * * That is the question here.  It is not altered by the fact that the claim of loss relates to an item of gross income which had accrued in the same year.  [Id. at 184-185.]

Pursuant to these principles, an accrual basis taxpayer generally must accrue income once the all-events test is satisfied, even though payment may be postponed until a subsequent year.  Harmont Plaza, Inc. v. Commissioner, 64 T.C. 632, 648, 649 (1975), affd. 549 F.2d 414 (6th Cir. 1977); Georgia School-Book Depository, Inc. v. Commissioner, 1 T.C. 463, 468 (1943).  As a limited exception to this rule, accrual may not be required if the income was of doubtful collectibility or it was reasonably certain that it would not be collected as of the time the taxpayer's right to receive the income arose.  Harmont Plaza, Inc. v. Commissioner, supra at 649-650; Atl. Coast Line R.R. v. Commissioner, 31 B.T.A. 730, 751 (1934), affd. 81 F.2d 309 (4th

Cir. 1936).[13]  The income-accrual exception is narrowly applied

so not to "be allowed to swallow up the fundamental rule upon

which it is engrafted" requiring accrual.  Georgia School-Book

Depository, Inc. v. Commissioner, supra at 469.  The exception

has typically been applied where the debtor is "insolvent or in

fact bankrupt."  Harmont Plaza, Inc. v. Commissioner, supra at

650.

Petitioner does not contend and the evidence does not show

that Flowers or Florida Marine was insolvent or bankrupt or that

the collectibility of their debts was otherwise called into

question by their respective financial conditions.  In any event,

Flowers and Florida Marine asserted their claims of offset only

after the barges were delivered under the second contract and

petitioner's right to the income had become fixed.  In fact,

insofar as the record shows, Florida Marine did not assert its

---

[13] Under this exception, "the fact that the obligation later
became worthless in part, even though within the same taxable
year is * * * immaterial".  Atl. Coast Line R.R. v. Commissioner,
31 B.T.A. 730, 751 (1934), affd. 81 F.2d 309 (4th Cir. 1936).  At
first blush there may appear to be some tension between this
statement and a statement in a Memorandum Opinion of this Court
that the income-accrual exception may apply "when, in the same
year that a taxpayer's right to income arises, collection and
receipt of the income become sufficiently doubtful or when it
becomes reasonably certain that the income will not be
collected."  Elec. Controls & Serv. Co. v. Commissioner, T.C.
Memo. 1996-486.  In that case, however, the Court held that
nonaccrual of certain contract payments was permitted in part
because of the contingent nature of the taxpayer's right to
receive the payments.  By contrast, petitioner's right to receive
the deferred payments under the second contract was unconditional
and fixed upon delivery of the barges.

offset claims until March 2003, after the close of the taxable year in which petitioner's right to the income under the second contract had arisen.  In these circumstances, postponing accrual of the income is not justified.

In conclusion, in 2002 petitioner was required to accrue the deferred payments due on the barges delivered that year under the second contract.

2.   Deductibility of Withheld Payments Under Section 461(f)

Alternatively, petitioner claims that pursuant to section 461(f) it is entitled to deduct $4,520,000 in 2002 on the ground that it "transferred" this amount to Flowers and Florida Marine in satisfaction of their disputed claims for damages with respect to allegedly defective barges that Trinity delivered under the first contracts.

An accrual basis taxpayer generally may take a liability into account only in the taxable year in which all events have occurred to allow the fact and amount of the liability to be determined with reasonable accuracy and economic performance has occurred with respect to the liability.  Sec. 1.461-1(a)(2), Income Tax Regs.  If a liability is contingent on the outcome of a contested lawsuit, then it generally may not be taken into account until the dispute is resolved.  See Willamette Indus., Inc. v. Commissioner, 92 T.C. 1116, 1121 (1989), affd. 149 F.3d 1057 (9th Cir. 1998).  Section 461(f) provides a limited

exception to this general rule by permitting a taxpayer to deduct a contested liability, provided the taxpayer has transferred assets in the same tax year to satisfy the claimed liability. Section 461(f) provides in relevant part:

> SEC. 461(f). Contested Liabilities. -If-
>
> (1) the taxpayer contests an asserted liability,
>
> (2) the taxpayer transfers money or other property to provide for the satisfaction of the asserted liability,
>
> (3) the contest with respect to the asserted liability exists after the time of the transfer, and
>
> (4) but for the fact that the asserted liability is contested, a deduction would be allowed for the taxable year of the transfer * * * (or for an earlier taxable year) * * *
>
> then the deduction shall be allowed for the taxable year of the transfer. * * *

The burden of proof is on petitioner to show that it satisfies all four requirements of section 461(f). See Rule 142; Davies v. Commissioner, 101 T.C. 282, 286 (1993).

The parties disagree primarily as to whether petitioner meets the second requirement listed above that there be a transfer of money or other property in satisfaction of the asserted liability. Petitioner contends that it transferred property to Flowers and Florida Marine "when Flowers and Florida Marine withheld payment under the Second Contract as an offset against their alleged damages". The record shows, however, that the $4,520,000 of deferred payments as to which petitioner claims

a deduction came due under the second contract in 2003 and 2004. Flowers and Florida Marine cannot meaningfully be said to have withheld the deferred payments before they came due. At most, Flowers and Florida Marine threatened in 2002 to withhold the deferred payments, although as previously discussed the record does not establish that Florida Marine even asserted its offset claim before 2003.

Section 461(f) allows a deduction only for "the taxable year of the transfer." Consequently, even if we were to agree with petitioner that the withheld payments represented transfers of funds to Flowers or Florida Marine, we would conclude that the transfers occurred in 2003 and 2004, so that petitioner would not be entitled to the claimed deduction under section 461(f).[14]

More fundamentally, we disagree with petitioner's contention that the withholding of the deferred payments by Flowers and Florida Marine represented a transfer by petitioner within the meaning of section 461(f). The regulations require that the taxpayer transfer "money or other property beyond his control

---

[14] The record does not clearly establish what amount, if any, of deferred payments Flowers or Florida Marine might have withheld in 2002 with respect to barges delivered in 2001. Consequently, if we were to construe petitioner's claim, contrary to petitioner's own articulation of it, as encompassing amounts withheld by Flowers or Florida Marine in 2002 with respect to barges delivered in 2001, we would conclude that petitioner's claim must fail by virtue of its failure to carry its burden to prove the amount of payments withheld in 2002.

* * *. * * *  In order for money or other property to be beyond the control of a taxpayer, the taxpayer must relinquish all authority over such money or other property."  Sec. 1.461-2(c)(1), Income Tax Regs.  As a necessary corollary, and as common sense dictates, before a taxpayer may transfer money or other property beyond its control or authority, it first must have the money or other property within its control or authority.

Obviously, the deferred payments were not in petitioner's control or authority, at least not so long as Flowers and Florida Marine withheld them.  By withholding the deferred payments, Flowers and Florida Marine merely perpetuated their own control over these funds.  Although, as previously discussed, Trinity possessed contractual rights to the withheld payments sufficient to require accrual of the income, neither Trinity nor petitioner relinquished those rights, at least not in 2002, but instead vigorously disputed the claimed rights of offset.

In contending that the withheld payments constituted a transfer within the meaning of section 461(f), petitioner relies upon Chernin v. United States, 149 F.3d 805 (8th Cir. 1998).  Petitioner's reliance is misplaced.  In Chernin, the court held that a transfer was accomplished within the meaning of section 461(f) by a court-issued writ of garnishment that forced the taxpayer to transfer funds owed to him as compensation.  The court reasoned that the writ of garnishment "shifted actual

control over the funds from the taxpayer to the garnishees". Id. at 810. By contrast, in 2002 there was no court-issued writ or other order of any competent legal authority to force Trinity to transfer funds owed to it.

In sum, we conclude and hold that in 2002 petitioner did not transfer money or other property in satisfaction of Flowers' and Florida Marine's asserted liabilities and consequently is entitled to no deduction pursuant to section 461(f).

To reflect the foregoing and the parties' stipulation of settled issues,

Decision will be entered under Rule 155.